**Master Services and Purchasing Agreement**

This Master Services and Purchasing Agreement ("**Agreement**") is between Axon Enterprise, Inc., a Delaware corporation ("**Axon**"), and the agency on the Quote ("**Agency**"). This Agreement is effective as of the later of the (a) last signature date on this Agreement or (b) signature date on the Quote ("**Effective Date**"). Axon and Agency are each a "**Party**" and collectively "**Parties**". This Agreement governs Agency's purchase and use of the Axon Devices and Services detailed in the Quote Appendix ("**Quote**"). It is the intent of the Parties that this Agreement act as a master agreement governing all subsequent purchases by Agency for the same Axon products and services in the Quote, and all such subsequent quotes accepted by Agency shall be also incorporated into this Agreement by reference as a Quote. The Parties therefore agree as follows:

1  **Definitions**.
"**Axon Cloud Services**" means Axon's web services for Axon Evidence, Axon Records, Axon Dispatch, and interactions between Evidence.com and Axon Devices or Axon client software. Axon Cloud Service excludes third-party applications, hardware warranties, and my.evidence.com.

"**Axon Device**" means all hardware provided by Axon under this Agreement.

"**Quote**" means an offer to sell and is only valid for devices and services on the quote at the specified prices. Any terms within Agency's purchase order in response to a Quote will be void. Orders are subject to prior credit approval. Changes in the deployment estimated ship date may change charges in the Quote. Shipping dates are estimates only. Axon is not responsible for typographical errors in any offer by Axon, and Axon reserves the right to cancel any orders resulting from such errors.

"**Services**" means all services provided by Axon under this Agreement, including software, Axon Cloud Services, and professional services.

2  **Term**. This Agreement begins on the Effective Date and continues until all subscriptions hereunder have expired or have been terminated ("**Term**").

All subscriptions including Axon Evidence, Axon Fleet, Officer Safety Plans, Technology Assurance Plans, and TASER 7 plans begin after shipment of the applicable Axon Device. If Axon ships the Axon Device in the first half of the month, the start date is the 1st of the following month. If Axon ships the Axon Device in the second half of the month, the start date is the 15th of the following month. For purchases solely of Axon Evidence subscriptions, the start date is the Effective Date. Each subscription term ends upon completion of the subscription stated in the Quote ("**Subscription Term**").

Upon completion of the Subscription Term, the Subscription Term will automatically renew for an additional 5 years ("**Renewal Term**"). For purchase of TASER 7 as a standalone, Axon may increase pricing to its then-current list pricing for any Renewal Term. For all other purchases, Axon may increase pricing on all line items in the Quote up to 3% at the beginning of each year of the Renewal Term. New devices and services may require additional terms. Axon will not authorize services until Axon receives a signed Quote or accepts a purchase order, whichever is first.

3  **Payment**. Axon invoices upon shipment. Payment is due net 30 days from the invoice date. Payment obligations are non-cancelable. Agency will pay invoices without setoff, deduction, or withholding. If Axon sends a past due account to collections, Agency is responsible for collection and attorneys' fees.

4  **Taxes**. Agency is responsible for sales and other taxes associated with the order unless Agency provides Axon a valid tax exemption certificate.

5  **Shipping**. Axon may make partial shipments and ship Axon Devices from multiple locations. All shipments are FOB shipping point via common carrier. Title and risk of loss pass to Agency upon Axon's delivery to the common carrier. Agency is responsible for any shipping charges in the Quote.

6  **Returns**. All sales are final. Axon does not allow refunds or exchanges, except warranty returns or as provided by state or federal law.

Title: Master Services and Purchasing Agreement between Axon and Agency
Department: Legal
Version: 11.0
Release Date: 8/6/2020

Page 1 of 37

 **Master Services and Purchasing Agreement**

**7**      **Warranty**.

**7.1**      **Hardware Limited Warranty**. Axon warrants that Axon-manufactured Devices are free from defects in workmanship and materials for 1 year from the date of Agency's receipt, except Signal Sidearm, which Axon warrants for 30 months from the date of Agency's receipt. Axon warrants its Axon-manufactured accessories for 90-days from the date of Agency's receipt. Used conducted energy weapon ("**CEW**") cartridges are deemed to have operated properly. Extended warranties run from the expiration of the 1-year hardware warranty through the extended warranty term. Non-Axon manufactured Devices are not covered by Axon's warranty. Agency should contact the manufacturer for support of non-Axon manufactured Devices.

**7.2**      **Claims**. If Axon receives a valid warranty claim for an Axon manufactured Device during the warranty term, Axon's sole responsibility is to repair or replace the Device with the same or like Device, at Axon's option. A replacement Axon Device will be new or like new. Axon will warrant the replacement Axon Device for the longer of (a) the remaining warranty of the original Axon Device or (b) 90-days from the date of repair or replacement.

If Agency exchanges a device or part, the replacement item becomes Agency's property, and the replaced item becomes Axon's property. Before delivering a Axon Device for service, Agency must upload Axon Device data to Axon Evidence or download it and retain a copy. Axon is not responsible for any loss of software, data, or other information contained in storage media or any part of the Axon Device sent to Axon for service.

**7.3**      **Spare Axon Devices**. Axon may provide Agency a predetermined number of spare Axon Devices as detailed in the Quote ("**Spare Axon Devices**"). Spare Axon Devices will replace broken or non-functioning units. If Agency utilizes a Spare Axon Device, Agency must return to Axon, through Axon's warranty return process, any broken or non-functioning units. Axon will repair or replace the unit with a replacement Axon Device. Upon termination, Axon will invoice Agency the MSRP then in effect for all Spare Axon Devices provided. If Agency returns the Spare Axon Devices to Axon within 30 days of the invoice date, Axon will issue a credit and apply it against the invoice.

**7.4**      **Limitations**. Axon's warranty excludes damage related to: (a) failure to follow Axon Device use instructions; (b) Axon Devices used with equipment not manufactured or recommended by Axon; (c) abuse, misuse, or intentional damage to Axon Device; (d) force majeure; (e) Axon Devices repaired or modified by persons other than Axon without Axon's written permission; or (f) Axon Devices with a defaced or removed serial number.

**7.4.1**      **To the extent permitted by law, the above warranties and remedies are exclusive. Axon disclaims all other warranties, remedies, and conditions, whether oral, written, statutory, or implied. If statutory or implied warranties cannot be lawfully disclaimed, then such warranties are limited to the duration of the warranty described above and by the provisions in this Agreement.**

**7.4.2**      **Axon's cumulative liability to any Party for any loss or damage resulting from any claim, demand, or action arising out of or relating to any Axon Device or Service will not exceed the purchase price paid to Axon for the Axon Device, or if for Services, the amount paid for such Services over the 12 months preceding the claim. Neither Party will be liable for direct, special, indirect, incidental, punitive or consequential damages, however caused, whether for breach of warranty or contract, negligence, strict liability, tort or any other legal theory.**

**8**      **Statement of Work**. Certain Axon Devices and Services, including Axon Interview Room, Axon Channel Services, and Axon Fleet, may require a Statement of Work that details Axon's Service deliverables ("**SOW**"). In the event Axon provides an SOW to Agency, Axon is only responsible to perform Services described in the SOW. Additional services are out of scope. The Parties must document scope changes in a written and signed change order. Changes may require an equitable adjustment in fees or schedule. The SOW is incorporated into this Agreement by reference.

**9**      **Axon Device Warnings**. See www.axon.com/legal for the most current Axon Device warnings.

Title: Master Services and Purchasing Agreement between Axon and Agency
Department: Legal
Version: 11.0
Release Date: 8/6/2020

Page 2 of 37

 **Master Services and Purchasing Agreement**

10    **Design Changes**. Axon may make design changes to any Axon Device or Service without notifying Agency or making the same change to Axon Devices and Services previously purchased by Agency.

11    **Bundled Offerings**. Some offerings in bundled offerings may not be generally available at the time of Agency's purchase. Axon will not provide a refund, credit, or additional discount beyond what is in the Quote due to a delay of availability or Agency's election not to utilize any portion of an Axon bundle.

12    **Insurance**. Axon will maintain General Liability, Workers' Compensation, and Automobile Liability insurance. Upon request, Axon will supply certificates of insurance.

13    **Indemnification**. Axon will indemnify Agency's officers, directors, and employees ("**Agency Indemnitees**") against all claims, demands, losses, and reasonable expenses arising out of a third-party claim against an Agency Indemnitee resulting from any negligent act, error or omission, or willful misconduct by Axon under this Agreement, except to the extent of Agency's negligence or willful misconduct, or claims under workers compensation.

14    **IP Rights**. Axon owns and reserves all right, title, and interest in Axon devices and services and suggestions to Axon, including all related intellectual property rights. Agency will not cause any Axon proprietary rights to be violated.

15    **IP Indemnification**. Axon will indemnify Agency Indemnitees against all claims, losses, and reasonable expenses from any third-party claim alleging that the use of Axon Devices or Services infringes or misappropriates the third-party's intellectual property rights. Agency must promptly provide Axon with written notice of such claim, tender to Axon the defense or settlement of such claim at Axon's expense and cooperate fully with Axon in the defense or settlement of such claim. Axon's IP indemnification obligations do not apply to claims based on (a) modification of Axon Devices or Services by Agency or a third-party not approved by Axon; (b) use of Axon Devices and Services in combination with hardware or services not approved by Axon; (c) use of Axon Devices and Services other than as permitted in this Agreement; or (d) use of Axon software that is not the most current release provided by Axon.

16    **Agency Responsibilities**. Agency is responsible for (a) Agency's use of Axon Devices; (b) breach of this Agreement or violation of applicable law by Agency or an Agency end user; and (c) a dispute between Agency and a third-party over Agency's use of Axon Devices.

17    **Termination**.
      17.1   **For Breach**. A Party may terminate this Agreement for cause if it provides 30 days written notice of the breach to the other Party, and the breach remains uncured at the end of 30 days. If Agency terminates this Agreement due to Axon's uncured breach, Axon will refund prepaid amounts on a prorated basis based on the effective date of termination.

      17.2   **By Agency**. If sufficient funds are not appropriated or otherwise legally available to pay the fees, Agency may terminate this Agreement. Agency will deliver notice of termination under this section as soon as reasonably practicable.

      17.3   **Effect of Termination**. Upon termination of this Agreement, Agency rights immediately terminate. Agency remains responsible for all fees incurred before the effective date of termination. If Agency purchases Axon Devices for less than the manufacturer's suggested retail price ("**MSRP**") and this Agreement terminates before the end of the Term, Axon will invoice Agency the difference between the MSRP for Axon Devices received and amounts paid towards those Axon Devices. Only if terminating for non-appropriation, Agency may return Axon Devices to Axon within 30 days of termination. MSRP is the standalone price of the individual Axon Device at the time of sale. For bundled Axon Devices, MSRP is the standalone price of all individual components.

18    **Confidentiality**. "**Confidential Information**" means nonpublic information designated as confidential or, given the nature of the information or circumstances surrounding disclosure, should reasonably be understood to be confidential. Each Party will take reasonable measures to avoid disclosure, dissemination,

 **Master Services and Purchasing Agreement**

or unauthorized use of the other Party's Confidential Information. Unless required by law, neither Party will disclose the other Party's Confidential Information during the Term and for 5-years thereafter. Axon pricing is Confidential Information and competition sensitive. If Agency is required by law to disclose Axon pricing, to the extent allowed by law, Agency will provide notice to Axon before disclosure. Axon may publicly announce information related to this Agreement.

**19      General**.

**19.1      Force Majeure**. Neither Party will be liable for any delay or failure to perform due to a cause beyond a Party's reasonable control.

**19.2      Independent Contractors**. The Parties are independent contractors. Neither Party has the authority to bind the other. This Agreement does not create a partnership, franchise, joint venture, agency, fiduciary, or employment relationship between the Parties.

**19.3      Third-Party Beneficiaries**. There are no third-party beneficiaries under this Agreement.

**19.4      Non-Discrimination**. Neither Party nor its employees will discriminate against any person based on race; religion; creed; color; sex; gender identity and expression; pregnancy; childbirth; breastfeeding; medical conditions related to pregnancy, childbirth, or breastfeeding; sexual orientation; marital status; age; national origin; ancestry; genetic information; disability; veteran status; or any class protected by local, state, or federal law.

**19.5      Export Compliance**. Each Party will comply with all import and export control laws and regulations.

**19.6      Assignment**. Neither Party may assign this Agreement without the other Party's prior written consent. Axon may assign this Agreement, its rights, or obligations without consent: (a) to an affiliate or subsidiary; or (b) for purposes of financing, merger, acquisition, corporate reorganization, or sale of all or substantially all its assets. This Agreement is binding upon the Parties respective successors and assigns.

**19.7      Waiver**. No waiver or delay by either Party in exercising any right under this Agreement constitutes a waiver of that right.

**19.8      Severability**. If a court of competent jurisdiction holds any portion of this Agreement invalid or unenforceable, the remaining portions of this Agreement will remain in effect.

**19.9      Survival**. The following sections will survive termination: Payment, Warranty, Axon Device Warnings, Indemnification, IP Rights, and Agency Responsibilities.

**19.10      Governing Law**. The laws of the state where Agency is physically located, without reference to conflict of law rules, govern this Agreement and any dispute arising from it. The United Nations Convention for the International Sale of Goods does not apply to this Agreement.

**19.11      Notices**. All notices must be in English. Notices posted on Agency's Axon Evidence site are effective upon posting. Notices by email are effective on the sent date of the email. Notices by personal delivery are effective immediately. Contact information for notices:

| | |
|---|---|
| Axon: Axon Enterprise, Inc. | Agency: |
| Attn: Legal | Attn: |
| 17800 N. 85th Street | Street Address |
| Scottsdale, Arizona 85255 | City, State, Zip |
| legal@axon.com | Email |

**19.12      Entire Agreement**. This Agreement, including the Appendices and any SOW(s), represents the entire agreement between the Parties. This Agreement supersedes all prior agreements or understandings, whether written or verbal, regarding the subject matter of this Agreement. This

Agreement may only be modified or amended in a writing signed by the Parties.

Each representative identified below declares they have been expressly authorized to execute this Agreement as of the date of signature.

**Axon Enterprise, Inc.**                                      **Agency**

Signature: _____                    Signature: _____

Name: _____                    Name: _____

Title: _____                    Title: _____

Date: _____                    Date: _____

 **Master Services and Purchasing Agreement**

## Axon Cloud Services Terms of Use Appendix

**1** <u>**Definitions**</u>.

**"Agency Content"** is data uploaded into, ingested by, or created in Axon Cloud Services within Agency's tenant, including media or multimedia uploaded into Axon Cloud Services by Agency. Agency Content includes Evidence but excludes Non-Content Data.

"**Evidence**" is media or multimedia uploaded into Axon Evidence as 'evidence' by an Agency. Evidence is a subset of Agency Content.

"**Non-Content Data**" is data, configuration, and usage information about Agency's Axon Cloud Services tenant, Axon Devices and client software, and users that is transmitted or generated when using Axon Devices. Non-Content Data includes data about users captured during account management and customer support activities. Non-Content Data does not include Agency Content.

"**Personal Data**" means any information relating to an identified or identifiable natural person. An identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person.

**2** <u>**Access**</u>. Upon Axon granting Agency a subscription to Axon Cloud Services, Agency may access and use Axon Cloud Services to store and manage Agency Content. Agency may not exceed more end users than the Quote specifies. Axon Air requires an Axon Evidence subscription for each drone operator. For Axon Evidence Lite, Agency may access and use Axon Evidence only to store and manage TASER CEW and TASER CAM data ("**TASER Data**"). Agency may not upload non-TASER Data to Axon Evidence Lite.

**3** <u>**Agency Owns Agency Content**</u>. Agency controls and owns all right, title, and interest in Agency Content. Except as outlined herein, Axon obtains no interest in Agency Content, and Agency Content are not business records of Axon. Agency is solely responsible for uploading, sharing, managing, and deleting Agency Content. Axon will have limited access to Agency Content solely for providing and supporting Axon Cloud Services to Agency and Agency end users.

**4** <u>**Security**</u>. Axon will implement commercially reasonable and appropriate measures to secure Agency Content against accidental or unlawful loss, access or disclosure. Axon will maintain a comprehensive information security program to protect Axon Cloud Services and Agency Content including logical, physical access, vulnerability, risk, and configuration management; incident monitoring and response; encryption of uploaded digital evidence; security education; and data protection. Axon agrees to the Federal Bureau of Investigation Criminal Justice Information Services Security Addendum.

**5** <u>**Agency Responsibilities**</u>. Agency is responsible for (a) ensuring Agency owns Agency Content; (b) ensuring no Agency Content or Agency end user's use of Agency Content or Axon Cloud Services violates this Agreement or applicable laws; and (c) maintaining necessary computer equipment and Internet connections for use of Axon Cloud Services. If Agency becomes aware of any violation of this Agreement by an end user, Agency will immediately terminate that end user's access to Axon Cloud Services.

Agency will also maintain the security of end user names and passwords and security and access by end users to Agency Content. Agency is responsible for ensuring the configuration and utilization of Axon Cloud Services meet applicable Agency regulation and standards. Agency may not sell, transfer, or sublicense access to any other entity or person. Agency shall contact Axon immediately if an unauthorized party may be using Agency's account or Agency Content, or if account information is lost or stolen.



**Master Services and Purchasing Agreement**

6        **Privacy**. Axon will not disclose Agency Content or information about Agency except as compelled by a court or administrative body or required by law or regulation. If Axon receives a disclosure request for Agency Content, Axon will give Agency notice, unless legally prohibited from doing so, to allow Agency to file an objection with the court or administrative body. Agency agrees to allow Axon access to certain information from Agency to (a) perform troubleshooting services upon request or as part of regular diagnostic screening; (b) enforce this Agreement or policies governing the use of Axon Evidence; or (c) perform analytic and diagnostic evaluations of the systems.

7        **Axon Body 3 Wi-Fi Positioning**. Axon Body 3 cameras offer a feature to enhance location services where GPS/GNSS signals may not be available, for instance, within buildings or underground. Agency administrators can manage their choice to use this service within the administrative features of Axon Cloud Services. If Agency chooses to use this service, Axon must also enable the usage of the feature for Agency's Axon Cloud Services tenant. Agency will not see this option with Axon Cloud Services unless Axon has enabled Wi-Fi Positioning for Agency's Axon Cloud Services tenant. When Wi-Fi Positioning is enabled by both Axon and Agency, Non-Content and Personal Data will be sent to Skyhook Holdings, Inc. ("**Skyhook**") to facilitate the Wi-Fi Positioning functionality. Data controlled by Skyhook is outside the scope of the Axon Cloud Services Privacy Policy and is subject to the Skyhook Services Privacy Policy.

8        **Storage**. For Axon Unlimited Device Storage subscriptions, Agency may store unlimited data in Agency's Axon Evidence account only if data originates from Axon Capture or the applicable Axon Device. Axon may charge Agency additional fees for exceeding purchased storage amounts. Axon may place Agency Content that Agency has not viewed or accessed for 6 months into archival storage. Agency Content in archival storage will not have immediate availability and may take up to 24 hours to access.

9        **Location of Storage**. Axon may transfer Agency Content to third-party subcontractors for storage. Axon will determine the locations of data centers for storage of Agency Content. For United States agencies, Axon will ensure all Agency Content stored in Axon Cloud Services remains within the United States. Ownership of Agency Content remains with Agency.

10       **Suspension**. Axon may temporarily suspend Agency's or any end user's right to access or use any portion or all of Axon Cloud Services immediately upon notice, if Agency or end user's use of or registration for Axon Cloud Services may (a) pose a security risk to Axon Cloud Services or any third-party; (b) adversely impact Axon Cloud Services , the systems, or content of any other customer; (c) subject Axon, Axon's affiliates, or any third-party to liability; or (d) be fraudulent.

         Agency remains responsible for all fees incurred through suspension. Axon will not delete Agency Content because of suspension, except as specified in this Agreement.

11       **Axon Cloud Services Warranty**. Axon disclaims any warranties or responsibility for data corruption or errors before Agency uploads data to Axon Cloud Services.

12       **Axon Records**. Axon Records is the software-as-a-service product that is generally available at the time Agency purchases an OSP 7 bundle. During Agency's Axon Records Subscription Term, Agency will be entitled to receive Axon's Update and Upgrade releases on an if-and-when available basis.

         An "**Update**" is a generally available release of Axon Records that Axon makes available from time to time. An "**Upgrade**" includes (i) new versions of Axon Records that enhance features and functionality, as solely determined by Axon; and/or (ii) new versions of Axon Records that provide additional features or perform additional functions. Upgrades exclude new products that Axon introduces and markets as distinct products or applications.

         New or additional Axon products and applications, as well as any Axon professional services

 **Master Services and Purchasing Agreement**

needed to configure Axon Records, are not included. If Agency purchases Axon Records as part of a bundled offering, the Axon Record subscription begins on the later of the (1) start date of that bundled offering, or (2) date Axon provisions Axon Records to Agency.

**13** **Axon Cloud Services Restrictions**. Agency and Agency end users (including employees, contractors, agents, officers, volunteers, and directors), may not, or may not attempt to:

**13.1** copy, modify, tamper with, repair, or create derivative works of any part of Axon Cloud Services;

**13.2** reverse engineer, disassemble, or decompile Axon Cloud Services or apply any process to derive any source code included in Axon Cloud Services, or allow others to do the same;

**13.3** access or use Axon Cloud Services with the intent to gain unauthorized access, avoid incurring fees or exceeding usage limits or quotas;

**13.4** use trade secret information contained in Axon Cloud Services, except as expressly permitted in this Agreement;

**13.5** access Axon Cloud Services to build a competitive device or service or copy any features, functions, or graphics of Axon Cloud Services;

**13.6** remove, alter, or obscure any confidentiality or proprietary rights notices (including copyright and trademark notices) of Axon's or Axon's licensors on or within Axon Cloud Services; or

**13.7** use Axon Cloud Services to store or transmit infringing, libelous, or other unlawful or tortious material; to store or transmit material in violation of third-party privacy rights; or to store or transmit malicious code.

**14** **After Termination**. Axon will not delete Agency Content for 90-days following termination. There will be no functionality of Axon Cloud Services during these 90-days other than the ability to retrieve Agency Content. Agency will not incur additional fees if Agency downloads Agency Content from Axon Cloud Services during this time. Axon has no obligation to maintain or provide Agency Content after these 90-days and will thereafter, unless legally prohibited, delete all Agency Content. Upon request, Axon will provide written proof that Axon successfully deleted and fully removed all Agency Content from Axon Cloud Services.

**15** **Post-Termination Assistance**. Axon will provide Agency with the same post-termination data retrieval assistance that Axon generally makes available to all customers. Requests for Axon to provide additional assistance in downloading or transferring Agency Content, including requests for Axon's data egress service, will result in additional fees and Axon will not warrant or guarantee data integrity or readability in the external system.

**16** **U.S. Government Rights**. If Agency is a U.S. Federal department or using Axon Cloud Services on behalf of a U.S. Federal department, Axon Cloud Services is provided as a "commercial item," "commercial computer software," "commercial computer software documentation," and "technical data", as defined in the Federal Acquisition Regulation and Defense Federal Acquisition Regulation Supplement. If Agency is using Axon Cloud Services on behalf of the U.S. Government and these terms fail to meet the U.S. Government's needs or are inconsistent in any respect with federal law, Agency will immediately discontinue use of Axon Cloud Services.

**17** **Survival**. Upon any termination of this Agreement, the following sections in this Appendix will survive:  Agency Owns Agency Content, Storage, Axon Cloud Services Warranty, and Axon Cloud Services Restrictions.



**Master Services and Purchasing Agreement**

## Professional Services Appendix

1    <u>**Utilization of Services**</u>. Agency must use professional services as outlined in the Quote and this Appendix within 6 months of the Effective Date.

2    <u>**Body-Worn Camera Full Service (BWC Full Service)**</u>. BWC Full Service includes advance remote project planning and configuration support and up to 4 consecutive days of on-site service and a professional services manager to work with Agency to assess Agency's deployment and determine which on-site services are appropriate. If Agency requires more than 4 consecutive on-site days, Agency must purchase additional days. BWC Full Service options include:

| System set up and configuration |
| --- |
| <ul><li>Instructor-led setup of Axon View on smartphones (if applicable)</li><li>Configure categories and custom roles based on Agency need</li><li>Register cameras to Agency domain</li><li>Troubleshoot IT issues with Axon Evidence and Axon Dock ("**Dock**") access</li><li>One on-site session included</li></ul> |
| **Dock configuration** |
| <ul><li>Work with Agency to decide the ideal location of Docks and set configurations on Dock</li><li>Authenticate Dock with Axon Evidence using admin credentials from Agency</li><li>On-site assistance, not to include physical mounting of docks</li></ul> |
| **Best practice implementation planning session** |
| <ul><li>Provide considerations for the establishment of video policy and system operations best practices based on Axon's observations with other agencies</li><li>Discuss the importance of entering metadata in the field for organization purposes and other best practice for digital data management</li><li>Provide referrals of other agencies using the Axon camera devices and Axon Evidence</li><li>Recommend rollout plan based on review of shift schedules</li></ul> |
| **System Admin and troubleshooting training sessions** |
| Step-by-step explanation and assistance for Agency's configuration of security, roles & permissions, categories & retention, and other specific settings for Axon Evidence |
| **Axon instructor training (Train the Trainer)** |
| Training for Agency's in-house instructors who can support Agency's Axon camera and Axon Evidence training needs after Axon has fulfilled its contractual on-site obligations |
| **Evidence sharing training** |
| Tailored workflow instruction for Investigative Units on sharing Cases and Evidence with local prosecuting agencies |
| **End user go-live training and support sessions** |
| <ul><li>Assistance with device set up and configuration</li><li>Training on device use, Axon Evidence, and Evidence Sync</li></ul> |
| **Implementation document packet** |
| Axon Evidence administrator guides, camera implementation guides, network setup guide, sample policies, and categories & roles guide |
| **Post go-live review** |

3    <u>**Body-Worn Camera Starter Service (BWC Starter)**</u>. BWC Starter includes advance remote project planning and configuration support and one day of on-site Services and a professional services manager to work closely with Agency to assess Agency's deployment and determine which Services are appropriate. If Agency requires more than 1 day of on-site Services, Agency must purchase additional on-site Services. The BWC Starter options include:

 **Master Services and Purchasing Agreement**

**System set up and configuration (Remote Support)**
- Instructor-led setup of Axon View on smartphones (if applicable)
- Configure categories & custom roles based on Agency need
- Troubleshoot IT issues with Axon Evidence and Axon Dock ("**Dock**") access

**Dock configuration**
- Work with Agency to decide the ideal location of Dock setup and set configurations on Dock
- Authenticate Dock with Axon Evidence using "Administrator" credentials from Agency
- Does not include physical mounting of docks

**Axon instructor training (Train the Trainer)**
Training for Agency's in-house instructors who can support Agency's Axon camera and Axon Evidence training needs after Axon's has fulfilled its contracted on-site obligations

**End user go-live training and support sessions**
- Assistance with device set up and configuration
- Training on device use, Axon Evidence, and Evidence Sync

**Implementation document packet**
Axon Evidence administrator guides, camera implementation guides, network setup guide, sample policies, and categories & roles guide

4    **Body-Worn Camera Virtual 1-Day Service (BWC Virtual)**. BWC Virtual includes all items in the BWC Starter Service Package, except one day of on-site services.

5    **CEW Services Packages**. CEW Services Packages are detailed below:

**System set up and configuration**
- Configure Axon Evidence categories & custom roles based on Agency need.
- Troubleshoot IT issues with Axon Evidence.
- Register users and assign roles in Axon Evidence.
- **For the CEW Full Service Package**: On-site assistance included
- **For the CEW Starter Package**: Virtual assistance included

**Dedicated Project Manager**
Assignment of specific Axon representative for all aspects of planning the rollout (Project Manager). Ideally, Project Manager will be assigned to Agency 4–6 weeks before rollout

**Best practice implementation planning session to include:**
- Provide considerations for the establishment of CEW policy and system operations best practices based on Axon's observations with other agencies
- Discuss the importance of entering metadata and best practices for digital data management
- Provide referrals to other agencies using TASER CEWs and Axon Evidence
- **For the CEW Full Service Package:** On-site assistance included
- **For the CEW Starter Package:** Virtual assistance included

**System Admin and troubleshooting training sessions**
On-site sessions providing a step-by-step explanation and assistance for Agency's configuration of security, roles & permissions, categories & retention, and other specific settings for Axon Evidence

**Axon Evidence Instructor training**
- Provide training on the Axon Evidence to educate instructors who can support Agency's subsequent Axon Evidence training needs.
- **For the CEW Full Service Package:** Training for up to 3 individuals at Agency
- **For the CEW Starter Package:** Training for up to 1 individual at Agency



**Master Services and Purchasing Agreement**

| |
|---|
| **TASER CEW inspection and device assignment**<br>Axon's on-site professional services team will perform functions check on all new TASER CEW Smart weapons and assign them to a user on Axon Evidence. |
| **Post go-live review**<br>**For the CEW Full Service Package**: On-site assistance included.<br>**For the CEW Starter Package**: Virtual assistance included. |

**6**      **Smart Weapon Transition Service**. The Smart Weapon Transition Service includes:

| |
|---|
| **Archival of CEW Firing Logs**<br>Axon's on-site professional services team will upload CEW firing logs to Axon Evidence from all TASER CEW Smart Weapons that Agency is replacing with newer Smart Weapon models. |
| **Return of Old Weapons**<br>Axon's on-site professional service team will ship all old weapons back to Axon's headquarters.<br>Axon will provide Agency with a Certificate of Destruction |

*Note: CEW Full Service packages for TASER 7 include Smart Weapon Transition Service instead of 1-Day Device Specific Instructor Course.

**7**      **Signal Sidearm Installation Service**. If Agency purchases Signal Sidearm Installation Service, Axon will provide one day of on-site Services and one professional services manager and will cover the installation of up 100 Signal Sidearm devices per package purchased. Agency is responsible for providing an appropriate work area and ensuring all holsters that will have Signal Sidearm installed onto them are available on the agreed-upon installation date(s). Installation includes:

| |
|---|
| Removal of existing connection screws that affix a holster to a holster mount |
| Proper placement of the Signal Sidearm Mounting Plate between the holster and the mount |
| Reattachment of the holster to the mount using appropriate screws |
| Functional testing of Signal Sidearm device |

**8**      **Out of Scope Services**. Axon is only responsible to perform the professional services described in the Quote and this Appendix. Any additional professional services are out of scope. The Parties must document scope changes in a written and signed change order. Changes may require an equitable adjustment in the charges or schedule.

**9**      **Delivery of Services**. Axon personnel will work Monday through Friday, 8:30 a.m. to 5:30 p.m., except holidays. Axon will perform all on-site tasks over a consecutive timeframe. Axon will not charge Agency travel time by Axon personnel to Agency premises as work hours.

**10**      **Access Computer Systems to Perform Services**. Agency authorizes Axon to access relevant Agency computers and networks, solely for performing the Services. Axon will work to identify as soon as reasonably practicable resources and information Axon expects to use and will provide an initial itemized list to Agency. Agency is responsible for and assumes the risk of any problems, delays, losses, claims, or expenses resulting from the content, accuracy, completeness, and consistency of all data, materials, and information supplied by Agency.

**11**      **Site Preparation**. Axon will provide a hardcopy or digital copy of current user documentation for the Axon Devices ("**User Documentation**"). User Documentation will include all required environmental specifications for the professional Services and Axon Devices to operate per the Axon Device User Documentation. Before installation of Axon Devices (whether performed by Agency or Axon), Agency must prepare the location(s) where Axon Devices are to be installed ("**Installation Site**") per the environmental specifications in the Axon Device User Documentation. Following installation, Agency must maintain the Installation Site per the environmental specifications. If Axon modifies Axon Device User Documentation for any Axon Devices under this Agreement, Axon will provide the update to Agency when Axon generally releases it. If Axon



**Master Services and Purchasing Agreement**

modifies Axon Device User Documentation for any Axon Devices under this Agreement, Axon will provide the update to Agency when Axon generally releases it

12      **Acceptance**. When Axon completes professional Services, Axon will present an acceptance form ("**Acceptance Form**") to Agency. Agency will sign the Acceptance Form acknowledging completion. If Agency reasonably believes Axon did not complete the professional Services in substantial conformance with this Agreement, Agency must notify Axon in writing of the specific reasons for rejection within 7 calendar days from delivery of the Acceptance Form. Axon will address the issues and re-present the Acceptance Form for signature. If Axon does not receive the signed Acceptance Form or written notification of reasons for rejection within 7 calendar days of delivery of the Acceptance Form, Axon will deem Agency to have accepted the professional Services.

13      **Agency Network**. For work performed by Axon transiting or making use of Agency's network, Agency is solely responsible for maintenance and functionality of the network. In no event will Axon be liable for loss, damage, or corruption of Agency's network from any cause.



**Master Services and Purchasing Agreement**

## Technology Assurance Plan Appendix

If Technology Assurance Plan ("**TAP**") or a bundle including TAP is on the Quote, this appendix applies.

**1**     <u>**TAP Warranty**</u>. The TAP warranty is an extended warranty that starts at the end of the 1-year Hardware Limited Warranty.

**2**     <u>**Officer Safety Plan**</u>. If Agency purchases an Officer Safety Plan ("**OSP**"), Agency will receive the deliverables detailed in the Quote. Agency must accept delivery of the TASER CEW and accessories as soon as available from Axon.

**3**     <u>**OSP 7 Term**</u>. OSP 7 begins after Axon ships the Axon Body 3 or TASER 7 hardware to Agency. If Axon ships in the first half of the month, OSP 7 starts the 1st of the following month. If Axon ships in the second half of the month, OSP 7 starts the 15th of the following month ("**OSP 7 Term**").

**4**     <u>**TAP BWC Upgrade**</u>. If Agency has no outstanding payment obligations and purchased TAP, Axon will provide Agency a new Axon body-worn camera ("**BWC Upgrade**") as scheduled in the Quote. If Agency purchased TAP Axon will provide a BWC Upgrade that is the same or like Axon Device, at Axon's option. Axon makes no guarantee the BWC Upgrade will utilize the same accessories or Axon Dock.

**5**     <u>**TAP Dock Upgrade**</u>. If Agency has no outstanding payment obligations and purchased TAP, Axon will provide Agency a new Axon Dock as scheduled in the Quote ("**Dock Upgrade**"). Accessories associated with any Dock Upgrades are subject to change at Axon discretion. Dock Upgrades will only include a new Axon Dock bay configuration unless a new Axon Dock core is required for BWC compatibility. If Agency originally purchased a single-bay Axon Dock, the Dock Upgrade will be a single-bay Axon Dock model that is the same or like Axon Device, at Axon's option. If Agency originally purchased a multi-bay Axon Dock, the Dock Upgrade will be a multi-bay Axon Dock that is the same or like Axon Device, at Axon's option.

**6**     <u>**Upgrade Delay**</u>. Axon may ship the BWC and Dock Upgrades as scheduled in the Quote without prior confirmation from Agency unless the Parties agree in writing otherwise at least 90 days in advance. Axon may ship the final BWC and Dock Upgrade as scheduled in the Quote 60 days before the end of the Subscription Term without prior confirmation from Agency.

**7**     <u>**Upgrade Change**</u>. If Agency wants to change Axon Device models for the offered BWC or Dock Upgrade, Agency must pay the price difference between the MSRP for the offered BWC or Dock Upgrade and the MSRP for the model desired. If the model Agency desires has an MSRP less than the MSRP of the offered BWC Upgrade or Dock Upgrade, Axon will not provide a refund. The MSRP is the MSRP in effect at the time of the upgrade.

**8**     <u>**Return of Original Axon Device**</u>. Within 30 days of receiving a BWC or Dock Upgrade, Agency must return the original Axon Devices to Axon or destroy the Axon Devices and provide a certificate of destruction to Axon including serial numbers for the destroyed Axon Devices. If Agency does not return or destroy the Axon Devices, Axon will deactivate the serial numbers for the Axon Devices received by Agency.

**9**     <u>**Termination**</u>. If Agency's payment for TAP, OSP, or Axon Evidence is more than 30 days past due, Axon may terminate TAP or OSP. Once TAP or OSP terminates for any reason:

**9.1**     TAP and OSP coverage terminate as of the date of termination and no refunds will be given.

**9.2**     Axon will not and has no obligation to provide the Upgrade Models.

**9.3**     Agency must make any missed payments due to the termination before Agency may purchase any future TAP or OSP.

 **Master Services and Purchasing Agreement**

# TASER 7 Appendix

This TASER 7 Appendix applies to Agency's TASER 7, OSP 7, or OSP 7 Plus purchase from Axon.

**1**    **Duty Cartridge Replenishment Plan**. If the Quote includes "**Duty Cartridge Replenishment Plan**", Agency must purchase the plan for each CEW user. A CEW user includes officers that use a CEW in the line of duty and those that only use a CEW for training. Agency may not resell cartridges received. Axon will only replace cartridges used in the line of duty.

**2**    **Training**. If the Quote includes a training voucher, Agency must use the voucher within 1 year of issuance, or the voucher will be void. Axon will issue Agency a voucher annually beginning on the start of the TASER Subscription Term. The voucher has no cash value. Agency cannot exchange it for another device or service. Unless stated in the Quote, the voucher does not include travel expenses and will be Agency's responsibility. If the Quote includes Axon Online Training or Virtual Reality Content Empathy Development for Autism/Schizophrenia (collectively, "**Training Content**"), Agency may access Training Content. Axon will deliver all Training Content electronically.

**3**    **Extended Warranty**. If the Quote includes an extended warranty, the extended warranty coverage period warranty will be for a 5-year term, which includes the hardware manufacturer's warranty plus the 4-year extended term.

**4**    **Trade-in**. If the Quote contains a discount on CEW-related line items, including items related to OSP, then that discount may only be applied as a trade-in credit, and Agency must return used hardware and accessories associated with the discount ("**Trade-In Units**") to Axon. Agency must ship batteries via ground shipping. Axon will pay shipping costs of the return. If Axon does not receive Trade-In Units within the timeframe below, Axon will invoice Agency the value of the trade-in credit. Agency may not destroy Trade-In Units and receive a trade-in credit.

| Agency Size | Days to Return from Start Date of TASER 7 Subscription |
|---|---|
| Less than 100 officers | 30 days |
| 100 to 499 officers | 90 days |
| 500+ officers | 180 days |

**5**    **TASER 7 Subscription Term**. The TASER 7 Subscription Term for a standalone TASER 7 purchase begins on shipment of the TASER 7 hardware. The TASER 7 Subscription Term for OSP 7 begins on the OSP 7 Start date.

**6**    **Access Rights**. Upon Axon granting Agency a TASER 7 Axon Evidence subscription, Agency may access and use Axon Evidence for the storage and management of data from TASER 7 CEW devices during the TASER 7 Subscription Term. Agency may not upload any non-TASER 7 data or any other files to Axon Evidence. Agency may not exceed the number of end users than the Quote specifies.

**7**    **Privacy.** Axon will not disclose Agency Content or any information about Agency except as compelled by a court or administrative body or required by any law or regulation. Axon will give notice if any disclosure request is received for Agency Content, so Agency may file an objection with the court or administrative body. Agency acknowledges and agrees that Axon may access Agency Content to: (a) perform troubleshooting services upon request or as part of Axon's maintenance or diagnostic screenings; (b) enforce this Agreement or policies governing use of Axon Evidence; (c) generate aggregated data, excluding information that can be used to distinguish

Title: Master Services and Purchasing Agreement between Axon and Agency
Department: Legal
Version: 11.0
Release Date: 8/6/2020    Page 14 of 37



**Master Services and Purchasing Agreement**

or trace an individual's identity, either alone or when combined with other personal or identifying information that is linked or linkable to a specific individual (collectively, "**PII**"), to improve, analyze, support, and operate Axon's current and future devices and services.

8      **Termination**. If payment for TASER 7 is more than 30 days past due, Axon may terminate Agency's TASER 7 plan by notifying Agency. Upon termination for any reason, then as of the date of termination:

   8.1      TASER 7 extended warranties and access to Training Content will terminate. No refunds will be given.

   8.2      Axon will invoice Agency the remaining MSRP for TASER 7 products received before termination. If terminating for non-appropriations, Axon will not invoice Agency if Agency returns the CEW, rechargeable battery, holster, dock, core, training suits, and unused cartridges to Axon within 30 days of the date of termination.

   8.3      Agency will be responsible for payment of any missed payments due to the termination before being allowed to purchase any future TASER 7 plan.



**Master Services and Purchasing Agreement**

## Axon Auto-Tagging Appendix

**1** **Scope.** Axon Auto-Tagging consists of the development of a module to allow Axon Evidence to interact with Agency's Computer-Aided Dispatch ("**CAD**") or Records Management Systems ("**RMS**"). This allows end users to auto-populate Axon video meta-data with a case ID, category, and location-based on data maintained in Agency's CAD or RMS.

**2** **Support**. For thirty days after completing Auto-Tagging Services, Axon will provide up to 5 hours of remote support at no additional charge. Axon will provide free support due to a change in Axon Evidence, so long as long as Agency maintains an Axon Evidence and Auto-Tagging subscription. Axon will not provide support if a change is required because Agency changes its CAD or RMS.

**3** **Changes**. Axon is only responsible to perform the Services in this Appendix. Any additional Services are out of scope. The Parties must document scope changes in a written and signed change order. Changes may require an equitable adjustment in fees or schedule.

**4** **Agency Responsibilities**. Axon's performance of Auto-Tagging Services requires Agency to:
    **4.1** Make available relevant systems, including Agency's current CAD or RMS, for assessment by Axon (including remote access if possible);
    **4.2** Make required modifications, upgrades or alterations to Agency's hardware, facilities, systems and networks related to Axon's performance of Auto-Tagging Services;
    **4.3** Provide access to the premises where Axon is performing Auto-Tagging Services, subject to Agency safety and security restrictions, and allow Axon to enter and exit the premises with laptops and materials needed to perform Auto-Tagging Services;
    **4.4** Provide all infrastructure and software information (TCP/IP addresses, node names, network configuration) necessary for Axon to provide Auto-Tagging Services;
    **4.5** Promptly install and implement any software updates provided by Axon;
    **4.6** Ensure that all appropriate data backups are performed;
    **4.7** Provide assistance, participation, and approvals in testing Auto-Tagging Services;
    **4.8** Provide Axon with remote access to Agency's Axon Evidence account when required;
    **4.9** Notify Axon of any network or machine maintenance that may impact the performance of the module at Agency; and
    **4.10** Ensure reasonable availability of knowledgeable staff and personnel to provide timely, accurate, complete, and up-to-date documentation and information to Axon.

**5** **Access to Systems**. Agency authorizes Axon to access Agency's relevant computers, network systems, and CAD or RMS solely for performing Auto-Tagging Services. Axon will work diligently to identify as soon as reasonably practicable resources and information Axon expects to use and will provide an initial list to Agency. Agency is responsible for and assumes the risk of any problems, delays, losses, claims, or expenses resulting from the content, accuracy, completeness, and consistency of all data, materials, and information supplied by Agency.



**Master Services and Purchasing Agreement**

## Axon Fleet Appendix

**1**  **Agency Responsibilities**. Agency must ensure its infrastructure and vehicles adhere to the minimum requirements to operate Axon Fleet 2 or Axon Fleet 3 (collectively, "Axon Fleet") as established by Axon during the qualifier call and on-site assessment at Agency and in any technical qualifying questions. If Agency's representations are inaccurate, the Quote is subject to change.

**2**  **Cradlepoint**. If Agency purchases Cradlepoint Enterprise Cloud Manager, Agency will comply with Cradlepoint's end user license agreement. The term of the Cradlepoint license may differ from the Axon Evidence Subscription. If Agency requires Cradlepoint support, Agency will contact Cradlepoint directly.

**3**  **Third-party Installer**.  Axon will not be liable for the failure of Axon Fleet hardware to operate per specifications if such failure results from installation not performed by, or as directed by Axon.

**4**  **Wireless Offload Server.**
  **4.1**  **License Grant**. Axon grants Agency a non-exclusive, royalty-free, worldwide, perpetual license to use Wireless Offload Server ("**WOS**"). "Use" means storing, loading, installing, or executing WOS solely for data communication with Axon Devices for the number of licenses purchased. The WOS term begins upon the start of the Axon Evidence Subscription.
  **4.2**  **Restrictions**. Agency may not: (a) modify, alter, tamper with, repair, or create derivative works of WOS; (b) reverse engineer, disassemble, or decompile WOS, apply any process to derive the source code of WOS, or allow others to do so; (c) access or use WOS to avoid incurring fees or exceeding usage limits; (d) copy WOS in whole or part; (e) use trade secret information contained in WOS; (f) resell, rent, loan or sublicense WOS; (g) access WOS to build a competitive device or service or copy any features, functions or graphics of WOS; or (h) remove, alter or obscure any confidentiality or proprietary rights notices (including copyright and trademark notices) of Axon or Axon's licensors on or within WOS.
  **4.3**  **Updates**. If Agency purchases WOS maintenance, Axon will make updates and error corrections to WOS ("**WOS Updates**") available electronically via the Internet or media as determined by Axon. Agency is responsible for establishing and maintaining adequate Internet access to receive WOS Updates and maintaining computer equipment necessary for use of WOS. The Quote will detail the maintenance term.
  **4.4**  **WOS Support**. Upon request by Axon, Agency will provide Axon with access to Agency's store and forward servers solely for troubleshooting and maintenance.

**5**  **Axon Vehicle Software.**
  **5.1**  **License Grant**. Axon grants Agency a non-exclusive, royalty-free, worldwide, perpetual license to use ViewXL or Dashboard (collectively, "Axon Vehicle Software".) "Use" means storing, loading, installing, or executing Axon Vehicle Software solely for data communication with Axon Devices. The Axon Vehicle Software term begins upon the start of the Axon Evidence Subscription.
  **5.2**  **Restrictions**. Agency may not: (a) modify, alter, tamper with, repair, or create derivative works of Axon Vehicle Software; (b) reverse engineer, disassemble, or decompile Axon Vehicle Software, apply any process to derive the source code of Axon Vehicle Software, or allow others to do so; (c) access or use Axon Vehicle Software to avoid incurring fees or exceeding usage limits; (d) copy Axon Vehicle Software in whole or part; (e) use trade secret information contained in Axon Vehicle Software; (f) resell, rent, loan or sublicense Axon Vehicle Software; (g) access Axon Vehicle Software to build a competitive device or service or copy any features, functions or graphics of Axon Vehicle Software; or (h) remove, alter or obscure any confidentiality or proprietary rights notices (including copyright and trademark notices) of Axon or Axon's licensors on or within Axon Vehicle Software.



**Master Services and Purchasing Agreement**

**6**     **Axon Fleet Upgrade**. If Agency has no outstanding payment obligations and has purchased the "Fleet Technology Assurance Plan" (Fleet TAP), Axon will provide Agency with the same or like model of Fleet hardware ("Fleet Upgrade") as schedule on the Quote.

If Agency would like to change models for the Axon Fleet Upgrade, Agency must pay the difference between the MSRP for the offered Axon Fleet Upgrade and the MSRP for the model desired. The MSRP is the MSRP in effect at the time of the upgrade. Agency is responsible for the removal of previously installed hardware and installation of the Axon Fleet Upgrade.

Within 30 days of receiving the Axon Fleet Upgrade, Agency must return the original Axon Devices to Axon or destroy the Axon Devices and provide a certificate of destruction to Axon, including serial numbers of the destroyed Axon Devices. If Agency does not destroy or return the Axon Devices to Axon, Axon will deactivate the serial numbers for the Axon Devices received by Agency.

**7**     **Privacy**. Axon will not disclose Agency Content or any information about Agency except as compelled by a court or administrative body or required by any law or regulation. Axon will give notice if any disclosure request is received for Agency Content, so Agency may file an objection with the court or administrative body. Agency acknowledges and agrees that Axon may access Agency Content to: (a) perform troubleshooting services upon request or as part of Axon's maintenance or diagnostic screenings; (b) enforce this Agreement or policies governing use of Axon Evidence; (c) generate aggregated data, excluding information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information that is linked or linkable to a specific individual (collectively, "**PII**"), to improve, analyze, support, and operate Axon's current and future devices and services.

**8**     **Axon Fleet Termination.** Axon may terminate Agency's Fleet subscription for non-payment. Upon any termination:

**8.1**     Axon Fleet subscription coverage terminates, and no refunds will be given.

**8.2**     Axon will not and has no obligation to provide the Axon Fleet Upgrade.

**8.3**     Agency will be responsible for payment of any missed payments due to the termination before being allowed to purchase any future Fleet TAP.

 **Master Services and Purchasing Agreement**

## Axon Aware Appendix

This Axon Aware Appendix applies to both Axon Aware and Axon Aware Plus.

**1**     <u>**Axon Aware Subscription Term**</u>. If Agency purchases Axon Aware as part of a bundled offering, the Axon Aware subscription begins on the later of the (1) start date of that bundled offering, or (2) date Axon provisions Axon Aware to Agency.

     If Agency purchases Axon Aware as a standalone, the Axon Aware subscription begins the later of the (1) date Axon provisions Axon Aware to Agency, or (2) first day of the month following the Effective Date.

     The Axon Aware subscription term will end upon the completion of the Axon Evidence Subscription associated with Axon Aware.

**2**     <u>**Scope of Axon Aware**</u>. The scope of Axon Aware is to assist Agency with real-time situational awareness during critical incidents to improve officer safety, effectiveness, and awareness. In the event Agency uses Axon Aware outside this scope, Axon may initiate good-faith discussions with Agency on upgrading Agency's Axon Aware to better meet Agency's needs.

**3**     <u>**Axon Body 3 LTE Requirements**</u>. Axon Aware is only available and usable with an LTE enabled body-worn camera. Axon is not liable if Agency utilizes the LTE device outside of the coverage area or if the LTE carrier is unavailable. LTE coverage is only available in the United States, including any U.S. territories. Axon may utilize a carrier of Axon's choice to provide LTE service. Axon may change LTE carriers during the Term without Agency's consent.

**4**     <u>**Axon Fleet 3 LTE Requirements.**</u> Axon Aware is only available and usable with a Fleet 3 system configured with LTE modem and service.  Agency is responsible for providing LTE service for the modem.  Coverage and availability of LTE service is subject to Agency's LTE carrier.

**5**     <u>**Axon Aware Service Limitations**</u>. Agency acknowledges that LTE service is made available only within the operating range of the networks. Service may be temporarily refused, interrupted, or limited because of: (a) facilities limitations; (b) transmission limitations caused by atmospheric, terrain, other natural or artificial conditions adversely affecting transmission, weak batteries, system overcapacity, movement outside a service area or gaps in coverage in a service area and other causes reasonably outside of the carrier's control such as intentional or negligent acts of third parties that damage or impair the network or disrupt service; or (c) equipment modifications, upgrades, relocations, repairs, and other similar activities necessary for the proper or improved operation of service.

     With regard to Axon Body 3, Partner networks are made available as-is and the carrier makes no warranties or representations as to the availability or quality of roaming service provided by carrier partners, and the carrier will not be liable in any capacity for any errors, outages, or failures of carrier partner networks. Agency expressly understands and agrees that it has no contractual relationship whatsoever with the underlying wireless service provider or its affiliates or contractors and Agency is not a third-party beneficiary of any agreement between Axon and the underlying carrier.

**6**     <u>**Termination**</u>. Upon termination of this Agreement, or if Agency stops paying for Axon Aware or bundles that include Axon Aware, Axon will end Aware services, including any Axon-provided LTE service.

Title: Master Services and Purchasing Agreement between Axon and Agency
Department: Legal
Version: 11.0
Release Date: 8/6/2020          Page 19 of 37



**Master Services and Purchasing Agreement**

---

**Add-on Services Appendix**

This Appendix applies to Axon Citizen for Communities, Axon Redaction Assistant, and Axon Performance.

1    <u>**Subscription Term**</u>. If Agency purchases Axon Citizen for Communities, Axon Redaction Assistant, or Axon Performance as part of OSP 7, the subscription begins on the later of the (1) start date of the OSP 7 Term, or (2) date Axon provisions Axon Citizen for Communities, Axon Redaction Assistant, or Axon Performance to Agency.

If Agency purchases Axon Citizen for Communities, Axon Redaction Assistant, or Axon Performance as a standalone, the subscription begins the later of the (1) date Axon provisions Axon Citizen for Communities, Axon Redaction Assistant, or Axon Performance to Agency, or (2) first day of the month following the Effective Date.

The subscription term will end upon the completion of the Axon Evidence Subscription associated with the add-on.

2    <u>**Axon Citizen Storage**</u>. For Axon Citizen, Agency may store an unlimited amount of data submitted through the public portal ("**Portal Content**"), within Agency's Axon Evidence instance. The post-termination provisions outlined in the Axon Cloud Services Terms of Use Appendix also apply to Portal Content.

3    <u>**Performance Auto-Tagging Data**</u>. In order to provide some features of Axon Performance to Agency, Axon will need to store call for service data from Agency's CAD or RMS.



**Master Services and Purchasing Agreement**

## Flock Software Terms of Use Appendix

1       <u>**Definitions**</u>.
"**Aggregated Data**" means information that relates to a group or category of customers, from which individual customer identities have been removed, that is not linked or reasonably linkable to any customer, including via a device.

"**Authorized End User**" shall mean any individual employees, agents, or contractors of Customer accessing or using the Flock Services through the Web Interface, under the rights granted to Customer pursuant to this Agreement.

"**Customer**" will mean the Customer.

"**Customer Data**" will mean the data, media and content provided by Customer through the Flock Services. For the avoidance of doubt, the Customer Data will include the Footage and geolocation information and environmental data collected by sensors built into the Units.

"**Documentation**" will mean text and/or graphical documentation, whether in electronic or printed format, that describe the features, functions and operation of the Flock Services which are provided by Flock to Customer in accordance with the terms of this Agreement.

"**Embedded Software**" will mean the software and/or firmware embedded or preinstalled on the Flock Hardware.

"**Flock IP**" will mean the Flock Services, the Documentation, the Flock Hardware, the Embedded Software, the Installation Services, and any and all intellectual property therein or otherwise provided to Customer and/or its Authorized End Users in connection with the foregoing.

"**Flock Hardware**" shall mean the Flock Gate Cameras and any other physical elements that interact with the Embedded Software and the Web Interface to provide the Flock Services. The term "Flock Hardware" excludes the Embedded Software.

"**Flock Services**" means the provision, via the Web Interface, of Flock's software application for automatic license plate detection, searching image records, and sharing Footage.

"**Flock System**" means collectively, the Flock Hardware, Embedded Software, and Flock Services.

"**Footage**" means still images and/or video captured by the Flock Hardware in the course of and provided via the Flock Services.

"**Non-Customer End User**" means a Flock customer that has elected to give Customer access to its data in the Flock System.

"**Non-Customer End User Data**" means the Footage, geolocation data, environmental data and/or notifications of a Non-Customer End User.

"**Unit(s)**" shall mean the Flock Hardware together with the Embedded Software.

"**Web Interface**" means the website(s) or application(s) through which Customer and its Authorized End Users can access the Flock Services in accordance with the terms of this Agreement.

2       <u>**Flock Services**</u>.
    **2.1**       **Provision of Access**. Subject to the terms of this Agreement, Flock hereby grants to Customer a non-exclusive, non-transferable right to access the features and functions of



**Master Services and Purchasing Agreement**

the Flock Services via the Web Interface during the term of Customer's agreement, solely for the Authorized End Users. The Footage will be available for Customer to access via the Web Interface for 30 days. Authorized End Users will be required to sign up for an account, and select a password and username ("**User ID**"). Flock will also provide Customer the Documentation to be used in accessing and using the Flock Services. Customer shall be responsible for all acts and omissions of Authorized End Users, and any act or omission by an Authorized End User which, if undertaken by Customer, would constitute a breach of this Agreement, shall be deemed a breach of this Agreement by Customer. Customer shall undertake reasonable efforts to make all Authorized End Users aware of the provisions of this Agreement as applicable to such Authorized End User's use of the Flock Services and shall cause Authorized End Users to comply with such provisions. Flock may use the services of one or more third parties to deliver any part of the Flock Services, including without limitation using a third party to host the Web Interface which make the Flock Services available to Customer and Authorized End Users. Customer agrees to comply with any acceptable use policies and other terms of any third-party service provider that are provided or otherwise made available to Customer from time to time.

2.2     **Embedded Software License**. Subject to all terms of this Agreement, Flock grants Customer a limited, non-exclusive, non-transferable, non-sublicensable (except to the Authorized End Users), revocable right to use the Embedded Software as installed on the Flock Hardware by Flock; in each case, solely as necessary for Customer to use the Flock Services.

2.3     **Documentation License**. Subject to the terms of this Agreement, Flock hereby grants to Customer a non-exclusive, non-transferable right and license to use the Documentation during the Service Term for Customer's internal purposes in connection with its use of the Flock Services as contemplated herein.

2.4     **Usage Restrictions**. Customer will not, and will not permit any Authorized End Users to, (i) copy or duplicate any of the Flock IP; (ii) decompile, disassemble, reverse engineer or otherwise attempt to obtain or perceive the source code from which any software component of any of the Flock IP is compiled or interpreted, or apply any other process or procedure to derive the source code of any software included in the Flock IP, or attempt to do any of the foregoing, and Customer acknowledges that nothing in this Agreement will be construed to grant Customer any right to obtain or use such source code; (iii) modify, alter, tamper with or repair any of the Flock IP, or create any derivative product from any of the foregoing, or attempt to do any of the foregoing, except with the prior written consent of Flock; (vi) interfere or attempt to interfere in any manner with the functionality or proper working of any of the Flock IP; (v) remove, obscure, or alter any notice of any intellectual property or proprietary right appearing on or contained within any of the Application IP; (vii) use the Flock Services for timesharing or service bureau purposes or otherwise for the benefit of a third party or any purpose other than the Purpose; or (viii) assign, sublicense, sell, resell, lease, rent or otherwise transfer or convey, or pledge as security or otherwise encumber, Customer's rights under Sections 2.1, 2.2, or 2.3.

2.5     **Retained Rights; Ownership**. As between the Parties, subject to the rights granted in this Agreement, Flock and its licensors retain all right, title and interest in and to the Flock IP and its components, and Customer acknowledges that it neither owns nor acquires any additional rights in and to the foregoing not expressly granted by this Agreement. Customer further acknowledges that Flock retains the right to use the foregoing for any purpose in Flock's sole discretion. There are no implied rights.

2.6     **Suspension**. Notwithstanding anything to the contrary in this Agreement, Flock may temporarily suspend Customer's and any Authorized End User's access to any portion or all of the Flock IP if (i) Flock reasonably determines that (a) there is a threat or attack on



**Master Services and Purchasing Agreement**

any of the Flock IP; (b) Customer's or any Authorized End User's use of the Flock Service disrupts or poses a security risk to the Flock Service or any other customer or vendor of Flock; (c) Customer or any Authorized End User is/are using the Flock IP for fraudulent or illegal activities; (d) Flock's provision of the Flock Services to Customer or any Authorized End User is prohibited by applicable law; or (e) any vendor of Flock has suspended or terminated Flock's access to or use of any third party services or products required to enable Customer to access the Flock   (each such suspension, in accordance with this Section 2.6, a "**Service Suspension**"). Flock will make commercially reasonable efforts, circumstances permitting, to provide written notice of any Service Suspension to Customer (including notices sent to Flock's registered email address) and to provide updates regarding resumption of access to the Flock IP following any Service Suspension. Flock will use commercially reasonable efforts to resume providing access to the Application Service as soon as reasonably possible after the event giving rise to the Service Suspension is cured. Flock will extend the Customer's term by the duration of any suspension (for any continuous suspension lasting at least one full day) where the service suspension is not caused by the direct Customer's actions or by the actions of parties associated with the Customer. Flock will have no liability for any damage, liabilities, losses (including any loss of data or profits) or any other consequences that Customer or any Authorized End User may incur as a result of a Service Suspension.

**3**    **Installation Services**.

**3.1**    **Designated Locations**. Prior to performing the physical installation of the Units, Flock shall advise Customer on the location and positioning of the Units for optimal license plate image capture, as conditions and location allow. While Flock will provide advice regarding the location of positioning of such Units, Customer will have the ultimate decision regarding the location, position, and angle of the Units (each Unit location so designated by Customer, a "**Designated Location**"). Due to the fact that Customer selects the Designated Location, Flock shall have no liability to Customer resulting from any poor performance, functionality or Footage resulting from or otherwise relating to the Designated Locations, or delay in installation due to Customer's delay in identifying the choices for the Designated Locations, in ordering and/or having the Designated Location ready for installation including having all electrical work preinstalled and permits ready. Designated Locations that are suggested by Flock and accepted by Customer without alteration will be known as Flock Designated Locations. After a deployment plan with Designated Locations and equipment has been agreed upon by both Flock and the Customer, any subsequent changes to the deployment plan ("**Reinstalls**") driven by Customer's request will incur a charge for Flock's then-current list price for Reinstalls,  as listed in the then-current Reinstall Policy (available at https://www.flocksafety.com/reinstall-fee-schedule) and any equipment charges. These changes include but are not limited to camera re-positioning, adjusting of camera mounting, re-angling, removing foliage, camera replacement, changes to heights of poles, regardless of whether the need for Reinstalls related to vandalism, weather, theft, lack of criminal activity in view, and the like

**3.2**    **Customer's Installation Obligations**. Customer agrees to allow Flock and its agents reasonable access to the designated installation locations at all reasonable times upon reasonable notice for the purpose of performing the installation work. The "Customer Installation Obligations" include, to the extent required by the Deployment Plan, but are not limited to electrical work to provide a reliable source of 120V AC power that follow Flock guidelines and comply with local regulations if adequate solar exposure is not available. Customer is solely responsible for (i) any permits or associated costs, and managing the permitting process; (ii)  any permits or associated costs, any federal, state or local taxes including property, license, privilege, sales, use, excise, gross receipts or other similar taxes which may now or hereafter become applicable to, measured by or imposed upon or with respect to the installation of the Flock Hardware, its use, or any other services performed in connection therewith and that Customer shall be solely responsible for the



**Master Services and Purchasing Agreement**

foregoing. Customer represents and warrants that it has all necessary right title and authority and hereby authorizes Flock to install the Flock Hardware at the Designated Locations and to make any necessary inspections or tests in connection with such installation.

3.3     **Flock's Installation Obligations**. The Flock Hardware shall be installed in a workmanlike manner in accordance with Flock's standard installation procedures, and the installation will be completed within a reasonable time from the time the Designated Locations are selected by Customer. Following the initial installation of the Flock Hardware, Flock's obligation to perform installation work shall cease; however, Flock will continue to monitor the performance of the Units, and receive access to the Footage for a period of 3 business days for maintenance purposes. Customer can opt out of Flock's access in the preceding sentence, which would waive Flock's responsibility to ensure such action was successful. Customer understands and agrees that the Flock Services will not function without the Flock Hardware.

3.4     **Theft and Damage**. Flock agrees to replace the Flock Hardware up to 1 time during the Term, at no cost to Customer, in the event of theft or damage. Subsequent replacement due to damage or theft will be at Customer's own expense, at a replacement cost of $300 per camera. Customer shall not be required to replace subsequently damaged or stolen units; however, Customer understands and agrees that functionality, including Footage, will be materially affected due to such subsequently damaged or stolen units and that Flock will have no liability to Customer regarding such affected functionality nor shall the Fees owed be impacted.

3.5     **Security Interest**. The Flock Hardware shall remain the personal property of Flock and will be removed upon the termination or expiration of Customer's Agreement. Customer agrees to perform all acts which may be necessary to assure the retention of title of the Flock Hardware by Flock. Should Customer default in any payment for the Flock Services or any part thereof or offer to sell or auction the Flock Hardware, then Customer authorizes and empowers Flock to remove the Flock Hardware or any part thereof. Such removal, if made by Flock, shall not be deemed a waiver of Flock's rights to any damages Flock may sustain as a result of Customer's default and Flock shall have the right to enforce any other legal remedy or right.

3.6     **Hazardous Conditions**. Unless otherwise stated in the Agreement, Flock's price for its services under this Agreement does not contemplate work in any areas that contain hazardous materials, or other hazardous conditions, including, without limit, asbestos. In the event any such hazardous materials are discovered in the designated locations in which Flock is to perform services under this Agreement, Flock shall have the right to cease work immediately in the area affected until such materials are removed or rendered harmless. Any additional expenses incurred by Flock as a result of the discovery or presence of hazardous material or hazardous conditions shall be the responsibility of Customer and shall be paid promptly upon billing.

4     <u>**Customer Representations and Warranties**</u>. Customer represents, covenants, and warrants that Customer will use the Flock Services only in compliance with this Agreement and all applicable laws and regulations, including but not limited to any laws relating to the recording or sharing of video, photo, or audio content and retention thereof. Customer hereby agrees to indemnify and hold harmless Flock against any damages, losses, liabilities, settlements and expenses, including without limitation costs and attorneys' fees, in connection with any claim or action that arises from an alleged violation of the foregoing, Customer's Installation Obligations, or otherwise from Customer's use of the Services, Hardware and any Software, including any claim that such actions violate any applicable law or third party right.   Although Flock has no obligation to monitor Customer's use of the Services, Flock may do so and may prohibit any use of the Services it



**Master Services and Purchasing Agreement**

believes may be (or alleged to be) in violation of the foregoing

**5      Data, Feedback; Aggregated Statistics**.

    **5.1      Customer and Non-Customer End User Data**. As between Flock and Customer, all right, title and interest in the Customer Data and Non-Customer End User Data, belong to and are retained solely by Customer. Customer hereby grants to Flock a limited, non-exclusive, royalty-free, worldwide license to use the Customer Data and Non-Customer End User Data and perform all acts with respect to the Customer Data and Non-Customer End User Data as may be necessary for Flock to provide the Flock Services to Customer, and a non-exclusive, perpetual, irrevocable, worldwide, royalty-free, fully paid license to use, reproduce, modify and distribute the Customer Data and Non-Customer End User Data as a part of the Aggregated Data (as defined in Section 5.3 below). This Agreement does not by itself make any Non-Customer End User Data the sole property or the Proprietary Information of Customer. Flock will automatically delete Footage older than 30 days. Customer has a 30-day window to view, save and/or transmit Footage to the relevant government agency prior to its deletion.

    **5.2      Feedback**. If Customer provides any suggestions, ideas, enhancement requests, feedback, recommendations or other information relating to the subject matter hereunder, Customer hereby assigns (and will cause its agents and representatives to assign) to Flock all right, title and interest (including intellectual property rights) with respect to or resulting from any of the foregoing.

    **5.3      Aggregated Data**. Notwithstanding anything in this Agreement to the contrary, Flock shall have the right to collect and analyze data that does not refer to or identify Customer or any individuals or de-identifies such data and other information relating to the provision, use and performance of various aspects of the Flock Services and related systems and technologies (including, without limitation, information concerning Customer Data and data derived therefrom).  Customer acknowledges that Flock will be compiling Aggregated Data based on Customer Data and Non-Customer End User Data input into the Flock Services. Customer hereby grants Flock a non-exclusive, worldwide, perpetual, royalty-free right and license (during and after the Service Term hereof) to use and distribute such Aggregated Data to improve and enhance the Services and for other marketing, development, diagnostic and corrective purposes in connection with the Flock Services and other Flock offerings.  No rights or licenses are granted except as expressly set forth herein.

**6      Fees and Term.** The initial term of the Flock Services shall be for the time period set forth on the Quote ("**Initial Flock Term**"). Following the Initial Flock Term, this Agreement will automatically renew for successive renewal terms of the length set forth on the Quote (each, a "**Flock Renewal Term**", and together with the Initial Flock Term, the "**Service Term**") unless either Party gives the other Party notice of non-renewal at least 30 days prior to the end of the then-current Service Term. The Service Term begins when all Flock Hardware is installed and has been validated as operational by Flock.

**7      Remedy; Warranty; and Disclaimer**.

    **7.1      Remedy**. Upon a malfunction or failure of Flock Hardware or Embedded Software (a "**Defect**"), Customer must first make commercially reasonable efforts to address the problem by contacting Flock's technical support. If such efforts do not correct the Defect, Flock shall, or shall instruct one of its contractors to, in its sole discretion, repair or replace the Flock Hardware or Embedded Software suffering from the Defect. Flock reserves the right to refuse or delay replacement or its choice of remedy for a Defect until after it has inspected and tested the affected Unit; provided that such inspection and test shall occur within 72 hours after Customer notifies the Flock of defect. Except for cameras owned by Customer, Flock agrees to replace cameras at a fee according to the then-current Reinstall Policy (https://www.flocksafety.com/reinstall-fee-schedule). Customer shall not be required



**Master Services and Purchasing Agreement**

to replace subsequently damaged or stolen units; however, Customer understands and agrees that functionality, including Footage, will be materially affected due to such subsequently damaged or stolen units and that Flock will have no liability to Customer regarding such affected functionality nor shall the Fees owed be impacted.

7.2 **Exclusions**. Flock will not provide the remedy described in Section 6.1 above if any of the following exclusions apply: (a) misuse of the Flock Hardware or Embedded Software in any manner, including operation of the Flock Hardware or Embedded Software in any way that does not strictly comply with any applicable specifications, documentation, or other restrictions on use provided by Flock; (b) damage, alteration, or modification of the Flock Hardware or Embedded Software in any way; or (c) combination of the Flock Hardware or Embedded Software with software, hardware or other technology that was not expressly authorized by Flock.

7.3 **Warranty**. Flock shall use reasonable efforts consistent with prevailing industry standards to maintain the Services in a manner which minimizes errors and interruptions in the Flock Services. Flock Services may be temporarily unavailable for scheduled maintenance or for unscheduled emergency maintenance, either by Flock or by third-party providers, or because of other causes beyond Flock's reasonable control, but Flock shall use reasonable efforts to provide advance notice in writing or by e-mail of any scheduled service disruption.

7.4 **Disclaimer**. THE REMEDY DESCRIBED IN SECTION 6.1 ABOVE IS CUSTOMER'S SOLE REMEDY, AND FLOCK'S SOLE LIABILITY, WITH RESPECT TO DEFECTIVE FLOCK HARDWARE AND/OR EMBEDDED SOFTWARE. THE FLOCK DOES NOT WARRANT THAT THE FLOCK SERVICES WILL BE UNINTERRUPTED OR ERROR FREE; NOR DOES IT MAKE ANY WARRANTY AS TO THE RESULTS THAT MAY BE OBTAINED FROM USE OF THE FLOCK SERVICES. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION, THE FLOCK SERVICES AND INSTALLATION SERVICES ARE PROVIDED "AS IS" AND FLOCK DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.

7.5 **Insurance**. Flock and Customer will each maintain commercial general liability policies with policy limits reasonably commensurate with the magnitude of their business risk. Certificates of Insurance will be provided upon request.

8 **Limitation of Liability and Indemnity**.
   8.1 **Limitation of Liability**. NOTWITHSTANDING ANYTHING TO THE CONTRARY, FLOCK AND ITS SUPPLIERS (INCLUDING BUT NOT LIMITED TO ALL FLOCK HARDWARE AND TECHNOLOGY SUPPLIERS), OFFICERS, AFFILIATES, REPRESENTATIVES, CONTRACTORS AND EMPLOYEES SHALL NOT BE RESPONSIBLE OR LIABLE WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR TERMS AND CONDITIONS RELATED THERETO UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY, PRODUCT LIABILITY, OR OTHER THEORY: (A) FOR ERROR OR INTERRUPTION OF USE OR FOR LOSS OR INACCURACY, INCOMPLETENESS OR CORRUPTION OF DATA OR FOOTAGE OR COST OF PROCUREMENT OF SUBSTITUTE GOODS, SERVICES OR TECHNOLOGY OR LOSS OF BUSINESS; (B) FOR ANY INDIRECT, EXEMPLARY, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES; (C) FOR ANY MATTER BEYOND FLOCK'S ACTUAL KNOWLEDGE OR REASONABLE CONTROL INCLUDING REPEAT CRIMINAL ACTIVITY OR INABILITY TO CAPTURE FOOTAGE OR IDENTIFY AND/OR CORRELATE A LICENSE PLATE WITH THE FBI DATABASE; (D) FOR ANY PUBLIC DISCLOSURE OF PROPRIETARY INFORMATION MADE IN GOOD FAITH; (E) FOR CRIME PREVENTION; OR (F) FOR ANY AMOUNTS THAT, TOGETHER WITH AMOUNTS ASSOCIATED WITH ALL OTHER



**Master Services and Purchasing Agreement**

CLAIMS, EXCEED THE FEES PAID AND/OR PAYABLE BY CUSTOMER TO FLOCK FOR THE FLOCK SERVICES UNDER THIS AGREEMENT IN THE 12 MONTHS PRIOR TO THE ACT THAT GAVE RISE TO THE LIABILITY, IN EACH CASE, WHETHER OR NOT FLOCK HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN THE EVENT OF AN EMERGENCY, CUSTOMER SHOULD CONTACT 911 AND SHOULD NOT RELY ON THE FLOCK SERVICES.

8.2 **Responsibility**. Each Party to this Agreement shall assume the responsibility and liability for the acts and omissions of its own employees, deputies, officers, or agents, in connection with the performance of their official duties under this Agreement. Each Party to this Agreement shall be liable (if at all) only for the torts of its own officers, agents, or employees that occur within the scope of their official duties. Customer will not pursue any claims or actions against Flock's suppliers.

8.3 **Indemnity**. Customer hereby agrees to indemnify and hold harmless Flock against any damages, losses, liabilities, settlements and expenses (including without limitation costs and attorneys' fees) in connection with any claim or action that arises from an alleged violation of Section 3, a breach of this Agreement, Customer's sharing of any data in connection with the Flock system, Flock employees or agent or Non-Customer End Users, or otherwise from Customer's use of the Flock Services, Flock Hardware and any Software, including any claim that such actions violate any applicable law or third party right. Although Flock has no obligation to monitor Customer's use of the Flock Services, Flock may do so and may prohibit any use of the Flock Services it believes may be (or alleged to be) in violation of the Section 3 or this Agreement.

9 **Data Preservation**. The Customer agrees to store Customer Data and Non-Customer End User Data in compliance with all applicable local, state, and federal laws, regulations, policies and ordinances and their associated record retention schedules. As part of Customer's consideration for paid access and no-fee access to the Flock System, to the extent that Flock is required by local, state or federal law to store the Customer Data or the Non-Customer End User Data, Customer agrees to preserve and securely store this data on Flock's behalf so that Flock can delete the data from its servers and, should Flock be legally compelled by judicial or government order, Flock may retrieve the data from Customer upon demand.

10 **Publicity**. Flock has the right to reference and use Customer's name and trademarks and disclose the nature of the Flock Services provided hereunder in each case in business and development and marketing efforts, including without limitation on Flock's website.

11 **Export**. Customer may not remove or export from the United States or allow the export or re-export of the Flock IP or anything related thereto, or any direct product thereof in violation of any restrictions, laws or regulations of the United States Department of Commerce, the United States Department of Treasury Office of Foreign Assets Control, or any other United States or foreign Customer or authority.  As defined in FAR section 2.101, the Flock Services, the Flock Hardware, the Embedded Software and Documentation are "commercial items" and according to DFAR section 252.2277014(a)(1) and (5) are deemed to be "commercial computer software" and "commercial computer software documentation." Consistent with DFAR section 227.7202 and FAR section 12.212, any use, modification, reproduction, release, performance, display, or disclosure of such commercial software or commercial software documentation by the U.S. Government will be governed solely by the terms of this Agreement and will be prohibited except to the extent expressly permitted by the terms of this Agreement.



**Master Services and Purchasing Agreement**

**Axon Commander™ Software Appendix**

**1**    <u>License</u>. Axon owns all executable instructions, images, icons, sound, and text in Commander. All rights are reserved to Axon. Axon grants a non-exclusive, royalty-free, worldwide right and license to use Commander. "Use" means storing, loading, installing, or executing Commander exclusively for data communication with an Axon Device. Agency may use Commander in a networked environment on computers other than the computer it installs Commander on, so long as each execution of Commander is for data communication with an Axon Device. Agency may make copies of Commander for archival purposes only. Agency shall retain all copyright, trademark, and proprietary notices in Commander on all copies or adaptations.

**2**    <u>Term</u>. The Quote will detail the duration of the Commander license, as well as any maintenance. The term will begin upon installation of Commander by Axon.

**3**    <u>License Restrictions</u>. All licenses will immediately terminate if Agency does not comply with any term of this Agreement. Agency may not use Commander for any purpose other than as expressly permitted by this Agreement. Agency may not:

    **3.1**    modify, tamper with, repair, or otherwise create derivative works of Commander;

    **3.2**    reverse engineer, disassemble, or decompile Commander or apply any process to derive the source code of Commander, or allow others to do the same;

    **3.3**    access or use Commander to avoid incurring fees or exceeding usage limits or quotas;

    **3.4**    copy Commander in whole or part, except as expressly permitted in this Agreement;

    **3.5**    use trade secret information contained in Commander;

    **3.6**    resell, rent, loan or sublicense Commander;

    **3.7**    access Commander to build a competitive device or service or copy any features, functions, or graphics of Commander; or

    **3.8**    remove, alter, or obscure any confidentiality or proprietary rights notices (including copyright and trademark notices) of Axon or Axon's licensors on or within Commander or any copies of Commander.

**4**    <u>Support</u>. Axon may make available updates and error corrections ("**Updates**") to Commander. Axon will provide Updates electronically via the Internet or media as determined by Axon. Agency is responsible for establishing and maintaining adequate access to the Internet to receive Updates. Agency is responsible for maintaining the computer equipment necessary to use Commander. Axon may provide technical support of a prior release/version of Commander for 6 months from when Axon made the subsequent release/version available.

**5**    <u>Termination</u>. Axon may terminate Agency's license immediately for Agency's failure to comply with any of the terms in this Agreement. Upon termination, Axon may disable Agency's right to login to Axon Commander.

Title: Master Services and Purchasing Agreement between Axon and Agency
Department: Legal
Version: 11.0
Release Date: 8/6/2020    Page 28 of 37



**Master Services and Purchasing Agreement**

## Axon Application Programming Interface Appendix

**1      Definitions.**
"**API Client**" means the software that acts as the interface between Agency's computer and the server, which is already developed or to be developed by Agency.

"**API Interface**" means software implemented by Agency to configure Agency's independent API Client Software to operate in conjunction with the API Service for Agency's authorized Use.

"**Axon Evidence Partner API, API or AXON API**" (collectively "**API Service**") means Axon's API which provides a programmatic means to access data in Agency's Axon Evidence account or integrate Agency's Axon Evidence account with other systems.

"**Use**" means any operation on Agency's data enabled by the supported API functionality.

**2      Purpose and License.**
  **2.1**      Agency may use API Service and data made available through API Service, in connection with an API Client developed by Agency. Axon may monitor Agency's use of API Service to ensure quality, improve Axon devices and services, and verify compliance with this Agreement. Agency agrees to not interfere with such monitoring or obscure from Axon Agency's use of API Service. Agency will not use API Service for commercial use.
  **2.2**      Axon grants Agency a non-exclusive, non-transferable, non-sublicensable, worldwide, revocable right and license during the Term to use API Service, solely for Agency's Use in connection with Agency's API Client.
  **2.3**      Axon reserves the right to set limitations on Agency's use of the API Service, such as a quota on operations, to ensure stability and availability of Axon's API. Axon will use reasonable efforts to accommodate use beyond the designated limits.

**3      Configuration.** Agency will work independently to configure Agency's API Client with API Service for Agency's applicable Use. Agency will be required to provide certain information (such as identification or contact details) as part of the registration. Registration information provided to Axon must be accurate. Agency will inform Axon promptly of any updates. Upon Agency's registration, Axon will provide documentation outlining API Service information.

**4      Agency Responsibilities.** When using API Service, Agency and its end users may not:
  **4.1**      use API Service in any way other than as expressly permitted under this Agreement;
  **4.2**      use in any way that results in, or could result in, any security breach to Axon;
  **4.3**      perform an action with the intent of introducing any viruses, worms, defect, Trojan horses, malware, or any items of a destructive nature to Axon Devices and Services;
  **4.4**      interfere with, modify, disrupt or disable features or functionality of API Service or the servers or networks providing API Service;
  **4.5**      reverse engineer, decompile, disassemble, or translate or attempt to extract the source code from API Service or any related software;
  **4.6**      create an API Interface that functions substantially the same as API Service and offer it for use by third parties;
  **4.7**      provide use of API Service on a service bureau, rental or managed services basis or permit other individuals or entities to create links to API Service;
  **4.8**      frame or mirror API Service on any other server, or wireless or Internet-based device;
  **4.9**      make available to a third-party, any token, key, password or other login credentials to API Service;
  **4.10**    take any action or inaction resulting in illegal, unauthorized or improper purposes; or disclose Axon's API manual.

**5      API Content.** All content related to API Service, other than Agency Content or Agency's API Client



**Master Services and Purchasing Agreement**

content, is considered Axon's API Content, including:

**5.1**    the design, structure and naming of API Service fields in all responses and requests;

**5.2**    the resources available within API Service for which Agency takes actions on, such as evidence, cases, users, or reports; and

**5.3**    the structure of and relationship of API Service resources; and

**5.4**    the design of API Service, in any part or as a whole.

**6**    <u>**Prohibitions on API Content**</u>. Neither Agency nor its end users will use API content returned from the API Interface to:

**6.1**    scrape, build databases, or otherwise create permanent copies of such content, or keep cached copies longer than permitted by the cache header;

**6.2**    copy, translate, modify, create a derivative work of, sell, lease, lend, convey, distribute, publicly display, or sublicense to any third-party;

**6.3**    misrepresent the source or ownership; or

**6.4**    remove, alter, or obscure any confidentiality or proprietary rights notices (including copyright and trademark notices).

**7**    <u>**API Updates**</u>. Axon may update or modify the API Service from time to time ("**API Update**"). Agency is required to implement and use the most current version of API Service and to make any applicable changes to Agency's API Client required as a result of such API Update. API Updates may adversely affect how Agency's API Client access or communicate with API Service or the API Interface. Each API Client must contain means for Agency to update API Client to the most current version of API Service. Axon will provide support for 1 year following the release of an API Update for all depreciated API Service versions.

Title: Master Services and Purchasing Agreement between Axon and Agency
Department: Legal
Version: 11.0
Release Date: 8/6/2020                     Page 30 of 37

 **Master Services and Purchasing Agreement**

**Advanced User Management Appendix**

**1**  **Scope**. Advanced User Management allows Agency to (a) utilize bulk user creation and management, (b) automate user creation and management through System for Cross-domain Identity Management ("**SCIM**"), and (c) automate group creation and management through SCIM.

**2**  **Advanced User Management Configuration**. Agency will work independently to configure Agency's Advanced User Management for Agency's applicable Use. Upon request, Axon will provide general guidance to Agency, including documentation that details the setup and configuration process.

 **Master Services and Purchasing Agreement**

## Axon Channel Services Appendix

**1      Definitions.**
"**Axon Digital Evidence Management System**" means Axon Evidence or Axon Commander, as specified in the attached Channel Services Statement of Work.

"**Active Channel**" means a third-party system that is continuously communicating with an Axon Digital Evidence Management System.

"**Inactive Channel**" means a third-party system that will have a one-time communication to an Axon Digital Evidence Management System.

**2      Scope.** Agency currently has a third-party system or data repository from which Agency desires to share data with Axon Digital Evidence Management. Axon will facilitate the transfer of Agency's third-party data into an Axon Digital Evidence Management System or the transfer of Agency data out of an Axon Digital Evidence Management System as defined in the Channel Services Statement of Work ("**Channel Services SOW**"). Channel Services will not delete any Agency Content. Agency is responsible for verifying all necessary data is migrated correctly and retained per Agency policy.

**3      Purpose and Use.** Agency is responsible for verifying Agency has the right to share data from and provide access to third-party systems as it relates to the Services described in this Appendix and the Channel Services SOW. For Active Channels, Agency is responsible for any changes to a third-party system that may affect the functionality of the channel service. Any additional work required for the continuation of the Service may require additional fees. An Axon Field Engineer may require access to Agency's network and systems to perform the Services described in the Channel Services SOW. Agency is responsible for facilitating this access per all laws and policies applicable to Agency.

**4      Project Management.** Axon will assign a Project Manager to work closely with Agency's project manager and project team members and will be responsible for completing the tasks required to meet all contract deliverables on time and budget.

**5      Warranty.** Axon warrants that it will perform the Channel Services in a good and workmanlike manner.

**6      Monitoring.** Axon may monitor Agency's use of Channel Services to ensure quality, improve Axon devices and services, prepare invoices based on the total amount of data migrated, and verify compliance with this Agreement. Agency agrees not to interfere with such monitoring or obscure from Axon Agency's use of channel services.

**7      Agency's Responsibilities.** Axon's successful performance of the Channel Services requires Agency:
  **7.1**    Make available its relevant systems for assessment by Axon (including making these systems available to Axon via remote access);
  **7.2**    Provide access to the building facilities and where Axon is to perform the Channel Services, subject to safety and security restrictions imposed by the Agency (including providing security passes or other necessary documentation to Axon representatives performing the Channel Services permitting them to enter and exit Agency premises with laptop personal computers and any other materials needed to perform the Channel Services);
  **7.3**    Provide all necessary infrastructure and software information (TCP/IP addresses, node names, and network configuration) for Axon to provide the Channel Services;
  **7.4**    Ensure all appropriate data backups are performed;
  **7.5**    Provide Axon with remote access to the Agency's network and third-party systems when required for Axon to perform the Channel Services;
  **7.6**    Notify Axon of any network or machine maintenance that may impact the performance of

 **Master Services and Purchasing Agreement**

the Channel Services; and

**7.7**    Ensure the reasonable availability by phone or email of knowledgeable staff, personnel, system administrators, and operators to provide timely, accurate, complete, and up-to-date documentation and information to Axon (these contacts are to provide background information and clarification of information required to perform the Channel Services).



**Master Services and Purchasing Agreement**

## VIEVU Data Migration Appendix

1    **Scope.** Agency currently has legacy data in the VIEVU Solution from which Agency desires to move to Axon Evidence. Axon will work with Agency to copy legacy data from the VIEVU solution into Axon Evidence ("**Migration**"). Before Migration, Agency and Axon will work together to develop a Statement of Work ("**Migration SOW**") to detail all deliverables and responsibilities. The Migration will require the availability of Agency resources. Such resources will be identified in the SOW. On-site support during Migration is not required. Upon Agency's request, Axon will provide on-site support for an additional fee. Any request for on-site support will need to be pre-scheduled and is subject to Axon's resource availability.

A small amount of unexposed data related to system information will not be migrated from the VIEVU solution to Axon Evidence. Upon request, some of this data can be manually exported before Migration and provided to Agency. The Migration SOW will provide further detail.

2    **Changes**. Axon is only responsible to perform the Services described in this Appendix and Migration SOW. Any additional services are out of scope. The Parties must document scope changes in a written and signed change order. Changes may require an equitable adjustment in the charges or schedule.

3    **Project Management**. Axon will assign a Project Manager to work closely with Agency's project manager and project team members and will be responsible for completing the tasks required to meet all contract deliverables on time and budget.

4    **Downtime**. There may be downtime during the Migration. The duration of the downtime will depend on the amount of data that Agency is migrating. Axon will work with Agency to minimize any downtime. Any VIEVU mobile application will need to be disabled upon Migration.

5    **Functionality Changes**. Due to device differences between the VIEVU solution and the Axon's Axon Evidence solution, there may be functionality gaps that will not allow for all migrated data to be displayed the same way in the user interface after Migration

6    **Acceptance**. Once the Migration is complete, Axon will notify Agency and an acceptance form. Agency is responsible for verifying that the scope of the project has been completed and all necessary data is migrated correctly and retained per Agency policy. Agency will have 90 days to provide Axon acceptance that the Migration was successful, or Axon will deem the Migration accepted.

In the event Agency does not accept the Migration, Agency agrees to notify the Axon within a reasonable time. Agency also agrees to allow Axon a reasonable time to resolve any issue. In the event Agency does not provide the Axon written rejection of the Migration during these 90 days, Agency may be charged for additional monthly storage costs. After Agency provides acceptance of the Migration, the Axon will delete all data from the VIEVU solution 90 days after the Migration.

7    **Post-Migration**. After Migration, the VIEVU solution may not be supported and updates may not be provided. Axon may end of life the VIEVU solution in the future. If Agency elects to maintain data within the VIEVU solution, Axon will provide Agency 90 days' notice before ending support for the VIEVU solution.

8    **Warranty.** Axon warrants that it will perform the Migration in a good and workmanlike manner.

9    **Monitoring**. Axon may monitor Agency's use of Migration to ensure quality, improve Axon devices and services, prepare invoices based on the total amount of data migrated, and verify compliance with this Agreement. Agency agrees not to interfere with such monitoring or obscure from Axon Agency's use of Migration.

 **Master Services and Purchasing Agreement**

## Axon Support Engineer Appendix

**1**     **Axon Support Engineer Payment.** Axon will invoice for Axon Support Engineer ("**ASE**") services, as outlined in the Quote, when the Axon Support Engineer commences work on-site at Agency.

**2**     **Full-Time ASE Scope of Services.**
    **2.1**     A Full-Time ASE will work on-site four (4) days per week.
    **2.2**     Agency's Axon sales representative and Axon's Agency Success team will work with Agency to define its support needs and ensure the Full-Time ASE has skills to align with those needs. There may be up to a 6-month waiting period before the Full-Time ASE can work on-site, depending upon Agency's needs and availability of a Full-Time ASE.
    **2.3**     The purchase of Full-Time ASE Services includes 2 complimentary Axon Accelerate tickets per year of the Agreement, so long as the ASE has started work at Agency, and Agency is current on all payments for the Full-Time ASE Service.

**The Full-Time ASE Service options are listed below:**

| |
|---|
| **Ongoing System Set-up and Configuration**<br>• Assisting with assigning cameras and registering docks<br>• Maintaining Agency's Axon Evidence account<br>• Connecting Agency to "Early Access" programs for new devices |
| **Account Maintenance**<br>• Conducting on-site training on new features and devices for Agency leadership team(s)<br>• Thoroughly documenting issues and workflows and suggesting new workflows to improve the effectiveness of the Axon program<br>• Conducting weekly meetings to cover current issues and program status |
| **Data Analysis**<br>• Providing on-demand Axon usage data to identify trends and insights for improving daily workflows<br>• Comparing Agency's Axon usage and trends to peers to establish best practices<br>• Proactively monitoring the health of Axon equipment and coordinating returns when needed |
| **Direct Support**<br>• Providing on-site, tier 1 and tier 2 technical support for Axon devices<br>• Proactively monitoring the health of Axon equipment<br>• Creating and monitoring RMAs on-site<br>• Providing Axon app support<br>• Monitoring and testing new firmware and workflows before they are released to Agency's production environment |
| **Agency Advocacy**<br>• Coordinating bi-annual voice of customer meetings with Axon's Device Management team<br>• Recording and tracking Agency feature requests and major bugs |

**3**     **Regional ASE Scope of Services**
    **3.1**     A Regional ASE will work on-site for 3 consecutive days per quarter. Agency must schedule the on-site days at least 2 weeks in advance. The Regional ASE will also be available by phone and email during regular business hours up to 8 hours per week.
    **3.2**     There may be up to a 6-month waiting period before Axon assigns a Regional ASE to Agency, depending upon the availability of a Regional ASE.
    **3.3**     The purchase of Regional ASE Services includes 2 complimentary Axon Accelerate tickets per year of the Agreement, so long as the ASE has started work at Agency and Agency is current on all payments for the Regional ASE Service.

**The Regional ASE service options are listed below:**



**Master Services and Purchasing Agreement**

| | |
|---|---|
| **Account Maintenance** | |
| • Conducting remote training on new features and devices for Agency's leadership | |
| • Thoroughly documenting issues and workflows and suggesting new workflows to improve the effectiveness of the Axon program | |
| • Conducting weekly conference calls to cover current issues and program status | |
| • Visiting Agency quarterly (up to 3 consecutive days) to perform a quarterly business review, discuss Agency's goals for your Axon program, and continue to ensure a successful deployment of Axon devices | |

| |
|---|
| **Direct Support** |
| • Providing remote, tier 1 and tier 2 technical support for Axon devices |
| • Creating and monitoring RMAs remotely |

| |
|---|
| **Data Analysis** |
| • Providing quarterly Axon usage data to identify trends and program efficiency opportunities |
| • Comparing an Agency's Axon usage and trends to peers to establish best practices |
| • Proactively monitoring the health of Axon equipment and coordinating returns when needed |

| |
|---|
| **Agency Advocacy** |
| • Coordinating bi-yearly Voice of Agency meetings with Device Management team |
| • Recording and tracking Agency feature requests and major bugs |

**4**      **Out of Scope Services.** The ASE is responsible to perform only the Services described in this Appendix. Any additional Services discussed or implied that are not defined explicitly in this Appendix will be considered out of the scope.

**5**      **ASE Leave Time**. The ASE will be allowed up 7 days of sick leave and up to 15 days of vacation time per each calendar year. The ASE will work with Agency to coordinate any time off and will provide Agency with at least 2 weeks' notice before utilizing any vacation days.

 **Master Services and Purchasing Agreement**

## Redaction Services Appendix

**1**  **Scope**. Each month of Axon Redaction Service, Agency may utilize up to the number of redacted videos included on the Quote, or the maximum number of hours, whichever comes first. In order to be considered one video, a video an Agency submits to Axon for redaction must be less than 1 hour. If a video is longer than 1 hour, it will be rounded up to the next hour. For example, if Agency submits a video for redaction and that video is 150 minutes, the video will be considered 3 hours. Agency may not rollover unused redactions and hours from one month to the next.

**2**  **Agency Responsibilities**.
    **2.1**  **Access**. Agency will create an account for Axon within Agency's Axon Evidence tenant. Agency must provision Axon to have only permission to view and redact videos identified for redaction. Upon completion of work or on a periodic basis in alignment with Agency's policy, Agency must manage or disable Axon's access within Agency's Axon Evidence tenant.
    **2.2**  **Policy**. Agency is responsible for providing Axon Agency's standard policy regarding redaction ("**Redaction Policy**"). The Redaction Policy should identify typical objects and audio that need to be redacted from video. Axon will redact videos per the Redaction Policy unless otherwise instructed in writing.

**3**  **Submission**. Agency will identify video for redaction and will submit requests to redactionservices@axon.com. Axon will redact the video according to the Redaction Policy within 72 hours. The redaction will be performed using Axon Evidence's Redaction Studio.

**4**  **Security**. Axon will use CJIS certified employees to perform all redaction services. Axon employees will perform all redactions in a CJIS compliant room.

**5**  **Acceptance of Redacted Video**. Upon completing the redaction, Axon will assign the redacted video to Agency. Agency will review the video within 5 business days of receipt and notify Axon of any required changes. If changes are necessary, Axon will perform such changes within 48 hours of notification. In the event Agency does not notify Axon of any requested changes within 5 business days of receipt of the redacted video, Axon will deem the redacted video accepted by Agency.

**6**  **Changes**. Axon is only responsible to perform the Services in this Appendix. Any additional Services are out of scope. The Parties must document scope changes in a written and signed change order. Changes may require an equitable adjustment in fees or schedule.